# In the United States Court of Federal Claims

No. 07-702C

(Filed: February 25, 2011)

| | |
|---|---|
| ***************************************** * | |
| * | |
| OK'S CASCADE COMPANY,      * | Termination for the Convenience |
| * | of the Government; Work |
| * | Performed Under Different |
| Plaintiff,      * | Contract Vehicle; Pre-Contract |
| * | Equipment Modernization Costs; |
| v.      * | Unabsorbed Overhead; Settlement |
| * | Proposal Preparation Costs; |
| THE UNITED STATES,      * | Failure to Disclose Proposed |
| * | Expert Witness. |
| Defendant.      * | |
| * | |
| ***************************************** * | |

*John Lukjanowicz*, Law Offices of John Lukjanowicz, PC, Seattle, Washington, for Plaintiff.

*Jacob A. Schunk*, with whom were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Steven J. Gillingham*, Assistant Director, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for Defendant.

OPINION AND ORDER

WHEELER, Judge.

    Plaintiff, OK's Cascade Company ("OK's Cascade") has presented a novel contract claim involving mobile food services for firefighters in remote locations. The United States Department of Agriculture, Forest Service, National Interagency Fire Center ("Forest Service" or "the agency") contracted with OK's Cascade for these services on July 7, 2004. However, due to the filing of multiple bid protests, the Forest Service suspended performance of the contract on July 26, 2004, and later terminated the contract for the convenience of the Government on August 18, 2004. Instead of providing mobile food services under the terminated contract, OK's Cascade performed in 2004 under higher-priced Emergency Equipment Rental Agreements ("EERAs")

issued by the Forest Service.  OK's Cascade claims that it is entitled to recover its costs from the termination for convenience even though it performed all of the services under a different contract vehicle.

OK's Cascade submitted a termination for convenience settlement proposal to the Forest Service's contracting officer on August 18, 2005.  In this proposal, OK's Cascade requested reimbursement of costs totaling $587,531, consisting of the following: (1) $174,724 to modernize mobile kitchen equipment and to comply with the Forest Service's solicitation requirements; (2) $402,806 in under-absorbed overhead costs from having less work under the EERAs than under the terminated contract; and (3) $10,000 in estimated proposal preparation costs.  After the contracting officer's requests for additional support from OK's Cascade went unanswered for more than nine months, the contracting officer issued a final decision denying the claim on September 27, 2006.  OK's Cascade received the final decision on October 3, 2006, and filed suit on September 28, 2007.  The Court has jurisdiction under the Contract Disputes Act, 41 U.S.C. § 609(a) (2006).

Defendant opposes OK's Cascade's claim because even though the Forest Service terminated the contract for convenience, OK's Cascade nevertheless performed all of the work it reasonably could have expected in 2004 through the higher-priced EERAs, and actually benefitted from the termination.  Defendant also asserts that OK's Cascade's costs of modernizing kitchen equipment to be more competitive on an upcoming procurement are not reimbursable by the Government.  Defendant further contends that all of OK's Cascade's damages calculations are defective, unreliable, and unsupported.

The Court conducted a trial in this matter during July 20-22, 2010 in Seattle, Washington.  The Court also received the testimony of a former contracting officer, John Venaglia, on August 4, 2010 in Washington, D.C.  Thereafter, the parties filed post-trial briefs on November 15, 2010, and post-trial response briefs on December 16, 2010.  The Court heard closing arguments on January 19, 2011.

As explained more fully below, the Court concludes that OK's Cascade is not entitled to any recovery.  OK's Cascade did not suffer any harm from the Forest Service's termination for convenience because OK's Cascade performed all of the anticipated work in 2004 under the higher-priced EERAs.  OK's Cascade received more money under the EERAs than it would have received under the terminated contract for the same work.  Further, the costs of modernizing the kitchen equipment are not recoverable from the Government.  OK's Cascade incurred these costs to be more competitive for upcoming mobile food service work.  These expenditures are a cost of doing business, and OK's Cascade assumed the risk of the level of new work the modernized equipment would produce.

The claim for $402,806 in under-absorbed overhead costs is premised on the idea that OK's Cascade performed EERAs for three kitchen unit locations, whereas it received an award for four kitchen unit locations under the terminated contract. However, the time period for the staffing of the fourth location in Albuquerque, New Mexico already had expired before the Forest Service awarded the contract to OK's Cascade on July 7, 2004, and, in any event, OK's Cascade actually provided services for Albuquerque under a pre-contract EERA. The factual premise for this claim thus is incorrect. Moreover, the evidence presented to support this portion of the claim was seriously flawed. Plaintiff's witness, John Reed, should have testified as an expert witness, but Plaintiff's counsel did not comply with the Court's rules for identifying expert witnesses during discovery. As a fact witness, Mr. Reed's testimony and work product suffered from serious hearsay and other evidentiary shortcomings.

OK's Cascade also cannot recover proposal preparation costs because they are not reasonable. OK's Cascade increased this element of its claim to $50,396.71 at trial, but the underlying claim lacks factual and legal support, and should not have been submitted to the Forest Service in the first place. By not properly qualifying Mr. Reed as an expert witness, and due to substantive flaws in Mr. Reed's analysis, the effort that generated the proposal preparation costs was inherently unreliable.

## Factual Background[1]

The Forest Service is responsible for contracting to provide mobile food services to fire event locations. (Stip. ¶¶ 1-2.)[2] These services include all phases of food preparation and related facilities such as tents and hand-washing stations. Id. ¶¶ 6-11. Prior to the 2004 solicitation at issue here, the Forest Service obtained services from OK's Cascade through a 1999 solicitation and the exercise of options available under that contract (the "previous solicitation"). Id. ¶ 9.

A. The 2004 National Mobile Food Services Solicitation

On February 13, 2004, the Forest Service issued solicitation RFP 49-03-07 (the "2004 Solicitation") as a partial small business set-aside, through which the agency intended to provide multiple awards for contracts that were referred to collectively as the National Mobile Food Services Contracts or "national contracts." (Stip. ¶ 1.) The intent of the solicitation was "to obtain Mobile Food Services to provide tasty, well balanced

---

[1] This statement of facts constitutes the Court's principal findings of fact under Rule 52(a) of the Rules of the Court of Federal Claims ("RCFC"). Other findings of fact and rulings on mixed questions of fact and law are set forth later in the analysis.

[2] In this opinion, the Court will refer to the trial transcript by witness and page as "Name, Tr. __," and to trial exhibits as "PX __" for Plaintiff's exhibits, and "DX __" for Defendant's exhibits. The parties' stipulations of fact, filed on June 24, 2010, will be referred to as "Stip. ¶ __."

hot and special meals, sack lunches, and hot and cold can meals, and supplemental items at various field locations some of which will be semi-remote." (DX 3.18.)[3] Section 1.1.2 of the solicitation specified that:

> [t]he service provided shall include all phases of food preparation and food service normally associated with the trade. Such service shall include all materials, food, equipment, labor, and overhead. Such as, but not necessarily limited to: kitchen unit management, planning, and control; purchase, receipt, storage, issue, handling, processing, packaging and shipping, preparation, food servicing, and clean up . . . .

Id.

In addition to food preparation, the mobile kitchen units were also required to provide comfortable eating facilities, including tents and hand-washing stations. Section 1.4.11 of the solicitation required that contractors provide "[w]aterproof tent(s) for the eating area(s) that are able to accommodate 175 persons comfortably . . . ." (DX 3.22.) The hand-washing facilities required by the solicitation include a unit for the kitchen employees and a station for the firefighters. (DX 3.34-35.) Section 3.1.1.4 provided that the firefighters' station must include, among other things, an operator to maintain and service the facility, at least four sinks, a 400-gallon capacity, hot and cold or warm (101 degrees Fahrenheit) running water, paper towels and soap, a mirror, lighting, and electrical outlets. (DX 3.35.) Section C of the solicitation also required a 24-hour coffee station be provided. (Stip. ¶ 14.)

The 2004 Solicitation stated that the performance period would be from the effective date of award through December 31, 2004. Id. ¶ 4. In addition, at the Government's option, the contract could be renewed for one-year periods, not to exceed three renewal periods. Id. Although the period of performance would run through 2004, the services provided under the contract were needed only during a fire event and, thus, there was no guarantee that the Government would need any of the contractor's services. See DX 3.19 ("Due to the sporadic occurrence of incident activity, the Government DOES NOT GUARANTEE placement of any order for service . . . .").

The mobile kitchen units would be assigned to Designated Dispatch Points ("DDPs"), from where they would be dispatched to provide catering services at fire event locations as needed. (Stip. ¶ 2.) The 2004 Solicitation informed offerors that "[t]he DDP will be the contractually approved physical location for the complete Mobile Kitchen Unit and other optional equipment to be kept within the defined availability dates." (DX 3.13.) Offerors were invited to propose a mobile kitchen unit for as many DDPs as they

---

[3] Defendant individually labeled the pages of its exhibits with the exhibit number and a page identification number. Where provided, the Court will use these markings to identify a specific page number for the exhibit. DX 3.18, therefore, is the nineteenth page of Defendant's Exhibit 3.

wished.  Id.  Each DDP had a defined Mandatory Availability Period ("MAP") during which the contractor was required to maintain its equipment.  (Stip. ¶ 3.)  Outside of the MAP, contractors had the option to remain at the designated point or to return to company headquarters.  Id.

Section M of the 2004 Solicitation informed the offerors of the evaluation factors considered in making an award.  (DX 3.133.)  Under Section M.3, offers were evaluated under two technical criteria, merits of the offer and capability of the offeror, as well as price.  Id.  The solicitation stated that the two "[t]echnical criteria are considered of equal importance, however, when combined technical criteria are significantly more important than price."  Id.  The merits of the offer were to be evaluated on the basis of (1) acceptability, (2) key personnel, (3) quality control, (4) equipment, and (5) business size. Id.  Under the equipment subfactor, the agency used a point system to objectively value the capability of the kitchen equipment offered.  (Stip. ¶ 17; DX 3.134.)  The 2004 Solicitation required that each primary kitchen unit for DDPs other than Alaska and Bakersfield, California, receive a minimum of 100 points to be considered for award. (Stip. ¶ 18; DX 3.134.)

B.  OK's Cascade's Response to the 2004 Solicitation

OK's Cascade has been a long-time supplier of mobile food services to the Forest Service.  (Stip. ¶ 9.)  OK's Cascade submitted its proposal in response to the 2004 Solicitation on March 31, 2004, and offered to provide five mobile kitchen units at eleven of the 26 DDPs.  Id. ¶ 22.  The kitchen units OK's Cascade offered were the same units it used under the previous contract and were identified as K-4, K-6, K-7, K-13, and K-14. Id.

OK's Cascade performed renovations to its kitchens prior to submitting its proposal under the 2004 Solicitation.  These changes included adding hand-washing stations, creating an enclosed beverage trailer, and increasing seating capacity, as well as general maintenance.  (Sonnichsen, Tr. 140-72.)  Some of the changes undertaken by OK's Cascade resulted in higher point totals under the agency's equipment evaluation system.  In the previous solicitation, the K-4 kitchen unit received a rating of 136, K-6 and K-7 received a rating of 90, and K-13 and K-14 received a rating of 127.  (Stip. ¶ 20.) In the 2004 Solicitation, K-4, K-6, and K-7 received a rating of 118, and K-13 and K-14 received a rating of 137.  Id. ¶ 21.

Based upon trial testimony, OK's Cascade understood that the equipment changes and improvements made to compete for an award under the 2004 Solicitation did not guarantee OK's Cascade a contract award, and were undertaken at the company's own risk.  The president of OK's Cascade, Jim Vuksic, testified that OK's Cascade made the improvements "hoping" to receive an award.  (Vuksic, Tr. 99.)  Mr. Vuksic knew there was no guarantee that OK's Cascade would receive an award, or that the Government

would compensate OK's Cascade for the equipment expenses incurred. (Vuksic, Tr. 95.) OK's Cascade's vice president, Wade McIntyre, and director of operations, Howard Sonnichsen, also testified that the equipment upgrades OK's Cascade made were at its own risk, with no guarantee of repayment or reimbursement from the Government. (McIntyre, Tr. 448; Sonnichsen, Tr. 177, 179.)

As part of the solicitation process, and in order to provide numerical evaluation ratings, the agency conducted inspections of the kitchen units. (Menke, Tr. 664.) Following the inspections, the agency requested a revised offer from OK's Cascade and provided a description of any issues the agency observed with the units. (DX 10.) The request for a revised offer stated:

> The sole purpose of this letter is to provide our observations as to the technical capability of your equipment and to give you the opportunity to revise your offer in these and those other areas that we have already discussed. The reason for allowing a revised offer is to allow you the opportunity to improve your standing in the competition. This letter is not intended to suggest that we are accepting your offer at this time; nor do I intend to suggest that we expect you to incur any further costs based on our recommendations. Any further costs you incur are at your own risk.

Id. In the inspection summary that followed, the agency's request again reiterated that "[t]his is not direction from us or authorization from us to incur costs for needed improvements. Rather these are simply our recommendations of weaknesses you should address in order to improve your overall score." (DX 10.1.)

C. The 2004 Fire Season

The national fire season runs from approximately the beginning of May through the end of November every year. (Menke, Tr. 664.) The 2004 procurement was delayed, and the Forest Service did not make its contract awards until July 7, 2004. (Draper, Tr. 221; Stip. ¶ 37.) There were no national contracts in place at the beginning of the 2004 fire season and the Forest Service utilized Emergency Equipment Rental Agreements ("EERAs") to fulfill its catering needs until the national contracts could be awarded. (Draper, Tr. 218.) The EERAs acted like national contracts and set forth the terms of agreement between a contractor and the Government to provide food services to firefighters. Id.

The agency issued EERA NIFC-04-F2 ("EERA-F2") to OK's Cascade on April 2, 2004. (PX 9.) Pursuant to that EERA, the Forest Service awarded OK's Cascade mobile food kitchen K-6 with a dispatch point in Albuquerque, New Mexico for the period May 1, 2004 to June 30, 2004, and unit K-14 with a dispatch point in Corona, California from June 15, 2004 to November 15, 2004. Id. On April 12, 2004, the agency issued

Modification No. 1 to EERA-F2, changing the beginning of the availability period for unit K-14 to June 1, 2004.  (PX 10.)  The agency rescinded EERA-F2 on May 10, 2004, and issued EERA NIFC-04-F10 ("EERA-F10") on that same date, which provided for the same dispatch points and availability periods as EERA-F2.  (PX 12; Stip. ¶ 30.)  On July 1, 2004, the day after the availability period in Albuquerque expired, the Forest Service issued Modification No. 1 to EERA-F10, adding mobile kitchen unit K-4 with a dispatch point in Wenatchee, Washington and an availability period from July 1, 2004 through October 15, 2004, and relocated unit K-6 to Reno, Nevada with an availability period from July 1, 2004 through October 31, 2004.  (DX 11.)

On July 7, 2004, the Forest Service awarded the national contracts.  (DX 12.)  The agency awarded four dispatch locations to OK's Cascade in the national contract.  (DX 13.)  OK's Cascade received an award for unit K-6 in Albuquerque, New Mexico, with an availability period of May 1, 2004 through June 30, 2004.  (DX 13.10.)  OK's Cascade received an award for unit K-7 in Wenatchee, Washington, from June 1, 2010 through October 15, 2010.  (DX 13.14.)  The agency awarded OK's Cascade unit K-13 for Fresno, California from June 1, 2004 through November 15, 2004, and unit K-14 for Okanogan, Washington from June 15, 2004 through October 31, 2004.  (DX 13.6; DX 13.18.)  In summary, under the national contract, OK's Cascade received the following dispatch locations:

| Kitchen Unit | Dispatch Point | Availability Period |
|---|---|---|
| K-6 | Albuquerque, NM | 05/01/04-06/30/04 |
| K-7 | Wenatchee, WA | 06/01/04-10/15/04 |
| K-13 | Fresno, CA | 06/01/04-11/15/04 |
| K-14 | Okanogan, WA | 06/15/04-10/31/04 |

On July 26, 2004, just nineteen days after issuing the national contracts, the Forest Service suspended all performance under the national contracts and converted the contracts to EERAs.  (Stip. ¶¶ 41-42.)  On July 27, 2004, the agency issued Modification No. 2 to EERA-F10, under which OK's Cascade maintained the same dispatch points and availability periods as it had been awarded under the national contract.  (DX 16.)  Specifically, under this modified EERA, OK's Cascade had the food services work for unit K-7 in Wenatchee from June 1, 2004 through October 15, 2004, unit K-13 in Fresno from June 1, 2004 through November 15, 2004, and unit K-14 in Okanogan from June 15, 2004 through October 31, 2004.  Id.

Although OK's Cascade did not receive the Albuquerque dispatch point in the modified EERA, the availability period for that location had already expired before the national contract had been awarded.  Furthermore, evidence at trial showed that, although the availability period for Albuquerque had expired, the Forest Service still offered OK's Cascade the opportunity to maintain Albuquerque as a dispatch point.  OK's Cascade declined this offer stating that it had "sent several of the trailers for other duty elsewhere

. . . so [it] couldn't respond to a dispatch." (DX 15.1.) Mr. Vuksic testified that he was aware of OK's Cascade's voluntary election to decline the Albuquerque award for unit K-6. (Vuksic, Tr. 101.) Mr. McIntyre corroborated this testimony. (McIntyre, Tr. 456-57.)

On August 18, 2004, the Forest Service terminated all of the national contracts. (DX 17.) The letter to the contractors explained that the contract was being terminated because the Forest Service had received multiple protests of the contract awards. Specifically, the letter stated:

> After review of the procurement record, the Government has decided to take corrective action concerning these awards. I am terminating all contracts awarded under RFP No. 49-03-07 and will issue a new solicitation after the current fire season. We are waiting until after the current fire season to issue a new solicitation in order to avoid diverting contractor and agency resources from wildland fire suppression activities during fire season. In the interim, we will continue to use the "Call-When-Needed" Emergency Equipment Rental Agreements. The aggregate of unusual circumstances surrounding this procurement led USDA to conclude that cancellation and resolicitation are necessary to restore the confidence of all offerors in this matter.

Id.

The national contracts incorporated by reference the standard termination for the convenience of the Government clause found at 48 C.F.R. ("FAR") § 52.249-2. (DX 13.82.) Contractors continued to provide mobile food services throughout the 2004 fire season under the EERAs. (DX 17.) The Government informed all contractors, including OK's Cascade, that it anticipated a "no-cost termination because Contractors have not yet performed or Contractors should have recouped any costs incurred pre-suspension through subsequent performance under the Emergency Equipment Rental Agreements." Id.

OK's Cascade provided mobile food services for the Forest Service throughout the 2004 fire season. (Stip. ¶ 48.) The Forest Service paid OK's Cascade $3,681,692.83 for meals provided during the 2004 fire season. (Stip. ¶ 46.) Under the post-contract EERA, OK's Cascade was able to charge a higher rate per meal than would have been permitted under the national contract. (McIntyre, Tr. 463-67.) These higher prices were for the same meals that would have been provided under the national contract. (McIntyre, Tr. 467.) The higher prices allowed under the EERA resulted in OK's Cascade being able to charge the Government $106,348.33 more for the meals provided than would have been permitted under the national contract. (DX 36.)

D. <u>Post-Termination Events</u>

Nearly one year after the Forest Service terminated the national contracts, on or about August 18, 2005, OK's Cascade submitted a 19-page settlement proposal to the Forest Service for $587,531, consisting of $174,724 for direct costs, $402,806 for under-absorbed overhead, and $10,000 in proposal preparation costs. (Stip. ¶ 51.) On October 31, 2005, Melinda Draper, the contracting officer, requested the Defense Contract Audit Agency ("DCAA") to audit the settlement proposal. (Stip. ¶ 52.)

The DCAA advised Ms. Draper that OK's Cascade's settlement proposal was "barely adequate for an audit." <u>Id.</u> Ms. Draper informed OK's Cascade of the DCAA's comments on December 2, 2005. (Stip. ¶ 53.) Ms. Draper also expressed concern that the claim included pre-contract costs and items that were common to both the terminated contract and the EERA, which would be prohibited under the Federal Acquisition Regulation cost principles. <u>Id.</u> Ms. Draper requested OK's Cascade to review the deficiencies and submit a revised settlement proposal. <u>Id.</u>

On September 27, 2006, having received no response, Ms. Draper sent OK's Cascade a final decision denying all proposed costs. (Stip. ¶ 54.) One year later, on September 28, 2007, OK's Cascade filed the present action seeking $587,531 in damages. <u>Id.</u> The Court held a three-day trial in Seattle, Washington beginning on July 20, 2010, and heard the testimony of a former Forest Service contracting officer, John Venaglia, in Washington, D.C. on August 4, 2010.

At trial, OK's Cascade presented only one accounting witness, John Reed, who testified as a fact witness, but not as an expert. Although Plaintiff's counsel attempted to present Mr. Reed as an expert, counsel had not disclosed Mr. Reed as an expert during discovery, and Mr. Reed did not submit any expert report. Nearly all of Mr. Reed's testimony was hearsay and he lacked any personal knowledge of the accuracy of the figures underlying the calculations presented.

In its post-trial briefs, OK's Cascade summarized its damages as $166,500 in direct costs, $402,806 in unabsorbed overhead, and $50,397 for proposal preparation costs. In total, OK's Cascade seeks $619,703 in damages from the United States for termination of the national contract.

E.  The Previous Solicitation and Other Contract-Related Events[4]

The 2004 Solicitation was not identical to the previous solicitation issued in 1999. For example, under the previous solicitation contractors were required to provide waterproof tents that could accommodate 150 persons, instead of the 175 required by the 2004 Solicitation.  (Stip. ¶¶ 9-10.)  The previous solicitation required hand-washing facilities only for the kitchen employees whereas the 2004 Solicitation required hand-washing facilities for the firefighters as well.  (Stip. ¶¶ 11-13.)  Perhaps most notably, whereas the previous solicitation required a total equipment score of 65 to be considered for an award, the 2004 Solicitation required a score of 100.  (Stip. ¶¶ 18-19.)

Some of these changes from the prior solicitation required the contractors to make upgrades to their equipment in order to remain competitive.  OK's Cascade remodeled and renovated units K-6, K-7, K-13, and K-14.  Renovations included incorporating more cooking equipment, such as tilt skillets and convection ovens, into the kitchens, and replacing the serving equipment previously installed.  (DX 6.)  OK's Cascade purchased all new tents and five transport vans to accommodate the tents and chairs.  Id.  OK's Cascade also provided new hand-washing facilities and acquired new beverage trailers.  Id.

In December 2003, a loosely organized trade association of mobile food service contractors met in Las Vegas, Nevada.  (Venaglia, Tr. 33.)  At that meeting, John Venaglia, the agency's contracting officer, informed the contractors that there would be changes to the requirements in the 2004 solicitation and that a new point system for equipment ratings would be utilized in the 2004 procurement.  (Venaglia, Tr. 34-35.)

OK's Cascade has had a rocky history with the Forest Service.  Disputes arose relating to OK's Cascade's performance under the previous contract, and in 2001 the contracting officer suspended OK's Cascade's work under that contract.  (McIntyre, Tr. 350.)  The contracting officer partially lifted the suspension, but only for one of OK's Cascade's five kitchen units.  (Vuksic, Tr. 42; McIntyre, Tr. 350.)  OK's Cascade submitted a claim to the Forest Service and the parties were able to settle the claim for $3.5 million after OK's Cascade arranged a meeting with senior agency officials in Washington, D.C.  (PX 26; McIntyre, Tr. 351-55.)  The agency replaced a former contracting officer by assigning Mr. Venaglia.  (McIntyre, Tr. 355.)

After the 2004 fire season concluded, the agency issued a request for proposals for the 2005 season on a total small business set-aside basis.  (Stip. ¶ 49.)  OK's Cascade is not an eligible small business and could not submit a proposal for the 2005 solicitation.

---

[4] Although the Court finds the previous solicitation and related events to be largely irrelevant to the legal issues presented in this case, the Court is nonetheless compelled to discuss these facts in order to address some of the arguments raised by Plaintiff.

<u>Discussion</u>

OK's Cascade argues that it has been injured by the agency's decision to terminate the national contract for convenience and that it should not be forced to underwrite the Government's decision to terminate.   OK's Cascade bears the burden of proof to demonstrate compensable damages resulting from the termination.  <u>Jacobs Eng'g Grp., Inc. v. United States</u>, 75 Fed. Cl. 752, 759 (2007).  The scope of damages that OK's Cascade can recover following the Government's termination for convenience is covered by the contract and the FAR terms incorporated therein.

To prevail on its claims, OK's Cascade must demonstrate that it has suffered an actual injury.  <u>See, e.g.</u>, <u>Centex Corp. v. United States</u>, 395 F.3d 1283 (Fed. Cir. 2005). In a breach of contract case, the innocent party should be placed in the same position that it would have been had the breach not occurred, but should not be placed in a better position.  <u>Bluebonnet Sav. Bank, FSB v. United States</u>, 339 F.3d 1341, 1345 (Fed. Cir. 2003).  Likewise, when the Government terminates a contract for convenience pursuant to the contract terms, the contractor is entitled to recover costs allowed by the contract and FAR provisions incorporated therein, but should not expect to be placed in a better position than had the contract run its normal course and the termination not transpired. As discussed below, OK's Cascade has suffered no compensable injury as a result of the termination for convenience and failed to carry its burden to demonstrate that the costs it seeks are recoverable under the terms of the national contract or the FAR.

A.  <u>OK's Cascade Has Not Suffered Any Injury.</u>

Plaintiff implores the Court to look at the "big picture" and insists that when its claims are viewed in this light, Plaintiff has suffered a significant injury from the Government's termination for convenience.  The Court has carefully reviewed the record and heard three days of trial testimony, but it cannot find any evidence that OK's Cascade suffered any injury from the termination for convenience.  Instead, it is indisputable from the facts presented that OK's Cascade performed all of the work awarded to it under the national contract through the EERAs and, in fact, was able to charge the Government a higher cost per meal under the EERAs than would have been permitted under the national contract.

Under the national contract, the Forest Service awarded mobile food services to OK's Cascade for three active dispatch points – Wenatchee, Fresno, and Okanogan.  (DX 13.)  The Forest Service also awarded the work for Albuquerque to OK's Cascade, but by the time the contract was awarded, the mandatory availability period for that dispatch point had already expired.  <u>Id.</u>  Immediately following the suspension of the national contract, the Forest Service awarded OK's Cascade, through an EERA, the same three active dispatch points for the same periods of time that it had been awarded under the

national contract. (DX 16.) Through the EERA, OK's Cascade performed all the work it was awarded for 2004 under the national contract. Because of the EERAs, OK's Cascade experienced no change in the scope of services requested following the Forest Service's termination for convenience. Simply put, OK's Cascade performed during the 2004 season as if the national contract had never been terminated because of the EERAs issued by the agency. The Court cannot ascertain how OK's Cascade possibly could have been injured when it performed as if no termination had occurred.

OK's Cascade nonetheless argues that it suffered over $600,000 in damages because of the Forest Service's termination for convenience. OK's Cascade presents four arguments in support of its claim. First, OK's Cascade argues it was injured because the EERAs provided services for only three mobile kitchen units, not the four units awarded under the national contract. (Pl.'s Post-Trial Br. Arg. 7.)[5] Second, OK's Cascade asserts that had it known it would be operating under EERAs with less stringent standards, it would not have undertaken the efforts to renovate its kitchens to meet the requirements for the 2004 Solicitation. (Pl.'s Post-Trial Resp. Br. 15.) Third, OK's Cascade states that its losses are compounded by the fact that it could not compete for the re-solicitation of the contract in the 2005 fire season because the solicitation in that year was a total small business set-aside. Id. Finally, OK's Cascade contends that it was harmed because it was not awarded any settlement for its claims, even though the Forest Service agreed to enter into settlements with some of OK's Cascade's competitors. Id.

OK's Cascade's argument that it was awarded fewer dispatch points and therefore incurred under-absorbed overhead as a result of the termination for convenience is not supported by the record. The Forest Service awarded OK's Cascade three active dispatch points under the national contract, and awarded it the same dispatch points under the post-contract EERA. Although OK's Cascade did not receive the Albuquerque dispatch point in the post-contract EERA, the availability period for that location had already expired before the termination for convenience occurred, and even before the national contract was awarded in the first place. Furthermore, OK's Cascade received a pre-contract EERA to provide services for the Albuquerque dispatch point for the same availability period provided in the national contract. Therefore, every dispatch point and availability period awarded to OK's Cascade under the national contract was also awarded to it by either a pre-contract or post-contract EERA. Additionally, the evidence at trial demonstrated that OK's Cascade, not the Government, requested the Albuquerque dispatch point to be removed from the post-contract EERA. (DX 15.1.) Despite OK's Cascade's insistence, the Court simply cannot conclude that the termination for convenience caused OK's Cascade to lose the work for a fourth mobile kitchen unit.

---

[5] Plaintiff's post-trial brief is divided into two sections with separate pagination. For clarity, the Court will cite to Plaintiff's post-trial filing entitled "Plaintiff's Proposed Findings of Fact" as "Pl.'s Post-Trial Br. Fact __" and will cite to "Plaintiff's Proposed Conclusions of Law" as "Pl.'s Post-Trial Br. Arg. __."

OK's Cascade's second argument, that had it known it would be operating under the EERAs and not the national contract, it would not have made the renovations to its kitchens to be more competitive in the 2004 Solicitation, is equally hollow.  Although the Court will discuss in more detail below whether pre-award costs such as these are recoverable, it is important to note that this "injury" was not caused by the termination for convenience.  This expense resulted from OK's Cascade's decision to compete for an award under the 2004 Solicitation.  OK's Cascade was aware that these costs were not reimbursable if it did not receive any award for a national contract, so it is puzzling why OK's Cascade believes it should be reimbursed under a terminated contract.  Furthermore, these costs would not have been recoverable if the contract had not been terminated, and because OK's Cascade's performance was essentially unaffected by the termination, there is no reason why these costs should be recovered now.

OK's Cascade's third argument in support of damages, that its injuries were compounded because it could not compete in the 2005 solicitation, must be based upon an expectation that it was entitled to performance during the option periods had the Forest Service not terminated the contract.  The national contract provided for services in 2004 and contained a provision that the services could be extended, at the agency's option, for a total of four years.  (DX 13.85.)  In essence, OK's Cascade argues that under the national contract it might have provided services beyond 2004 through the options, but because of the termination for convenience, its services were cut short.  OK's Cascade noted at trial that the agency has always exercised all available options.  (Sonnichsen, Tr. 119.)

Regardless of whether the agency has exercised options in the past, the national contract clearly stated that the Forest Service was under no obligation to do so again.  Section I.7(a) of the contract provides that the Government *may* extend the term of the contract by providing written notice to the contractor.  (DX 13.85.)  The Federal Circuit has held that contractors are not entitled to damages based upon the Government's failure to exercise options where the Government has the discretion to exercise the options, such as here.  Hi-Shear Tech. Corp. v. United States, 356 F.3d 1372, 1380 (Fed. Cir. 2004).  OK's Cascade cannot claim damages for the failure of the Government to exercise its option under the national contract.  OK's Cascade's argument that it sustained injuries by not being able to compete for services beyond the period provided under the contract is equally unavailing.

Finally, OK's Cascade appears to argue that, even if it would not otherwise be entitled to damages, the Forest Service somehow became liable to OK's Cascade by entering into settlement agreements with other contractors.[6]  OK's Cascade's argument is unsupported by the facts.  OK's Cascade bears the burden of proving that the *termination*

---

[6] The record shows that the Forest Service entered into settlement agreements with Blagg's Food Service for $12,239.48 (PX 48), with Cattlemen's Meat Company for $300,000 (PX 57), with Cowboy Catering for $35,000 (PX 53), and with Stewart's Firefighter Food Catering, Inc. for $219,065.30 (PX 65).

of the contract caused it harm.  It is illogical to suggest that the act of the Forest Service in entering into settlements with other contractors somehow caused injury to OK's Cascade.  At best, OK's Cascade's argument could be interpreted as suggesting that, by entering into settlement agreements with others, the Forest Service concedes that its termination caused injury to the contractors involved in the 2004 Solicitation.  However, even this position is critically flawed because OK's Cascade failed to establish that it is similarly situated to those other contractors.

In summary, OK's Cascade has failed to establish that it suffered any actual injury as a result of the Forest Service's termination for convenience.  OK's Cascade understandably is frustrated because it invested in renovating its equipment hoping to provide years of mobile food services to the Government, but this did not occur.  Nonetheless, OK's Cascade performed all of the services promised to it under the terminated contract at greater compensation than agreed to under that contract.  While OK's Cascade may have been disappointed that it would not be providing further mobile food services, such services were never promised to it and therefore cannot be a source of injury from the termination of the contract.

    B.  The Damages OK's Cascade Seeks Are Not Recoverable.

Even if OK's Cascade could demonstrate that it has suffered an injury as a result of the Forest Service's termination of the national contract, the costs that OK's Cascade asks the Court to award are not recoverable by law.  When the Government terminates a contract for convenience, the contractor should be fairly compensated "for the work done and the preparations made for the terminated portions of the contract, including a reasonable allowance for profit."  FAR § 49.201(a).  Because a termination for convenience is an authorized action under the contract, the costs that a contractor can recover under a termination for convenience are dictated by the terms of the parties' agreement.  In this case the contract incorporated by reference the FAR termination for convenience clause found at FAR § 52.249-2.  That clause provides that the contractor shall be paid (1) the price for completed services, (2) costs incurred in the performance of the work terminated, (3) settlement costs that are properly chargeable to the terminated portion of the contract, and (4) reasonable profit.  FAR § 52.249-2(g).  The clause further provides that the cost principles found in FAR Part 31 shall govern all costs claimed and agreed to under this section.  FAR § 52.249-2(i).  None of the damages OK's Cascade seeks are compensable under the FAR termination for convenience clause or the FAR cost principles.

    1.  Direct Costs

OK's Cascade seeks $174,724 in direct costs incurred to update and renovate its kitchens to comply with the requirements of the 2004 Solicitation and "increase OK's chances of multiple kitchen site award[s] . . . ."  (Pl.'s Post-Trial Br. Fact 18.)  Direct

costs can be recovered if they are "directly attributable to the performance of a specific contract and can be traced specifically to that contract." Nicon, Inc. v. United States, 331 F.3d 878, 882 (Fed. Cir. 2003) (citing Charles G. Williams Constr., Inc. v. White, 271 F.3d 1055, 1057-58 (Fed. Cir. 2001)). Directs costs that are incurred for "items reasonably usable on the contractor's other work" are not recoverable under the FAR cost principles. FAR § 31.205-42(a). It is undisputed that OK's Cascade's costs to modify and improve its mobile kitchen units were reasonably usable on the contractor's other work – namely OK's Cascade's work pursuant to the EERAs both before and after the national contract was awarded. Therefore, these costs are not recoverable under the FAR cost principles.

Furthermore, the costs to renovate the kitchens were pre-contract costs, not direct costs, because they were not directly attributable to the performance of the terminated contract but rather were incurred prior to the contract award "in anticipation of being awarded a contract for the fire season." (PX 66 2 n.1.) To recover pre-contract costs a contractor must show that the costs were (1) incurred in order to meet the contract delivery schedule, (2) incurred directly pursuant to the negotiation and in anticipation of the award, and (3) would have been allowable if incurred during contract performance. Penberthy Electromelt Int'l, Inc. v. United States, 11 Cl. Ct. 307, 315 (1986). OK's Cascade cannot meet its burden to demonstrate that its pre-contract costs are recoverable under the Penberthy requirements.

OK's Cascade argues that it should be reimbursed these costs because they were expended so that it could "be awarded a contract and . . . ready for the first day of contract performance." (Pl.'s Post-Trial Br. Arg. 6.) OK's Cascade's argument misconstrues the first and third Penberthy elements. A contractor cannot be awarded pre-contract costs expended to make itself more competitive to secure a contract award. Rather, pre-contract costs are to reimburse contractors for performance of contract items that must be undertaken prior to award in order to meet the contract schedule. Here, renovation of the mobile food kitchens is not a contract item and there was no provision in the contract that provided for the reimbursement of these costs. OK's Cascade invested these costs in its kitchens to make itself a more competitive contractor capable of meeting the solicitation requirements. These costs would not have been recoverable had the contract continued and OK's Cascade cannot now claim them as pre-contract costs simply because the contract was terminated.

Even if OK's Cascade could convince the Court that it fulfilled the first and third elements of the Penberthy test, it has presented no evidence to support its compliance with the second element. To fulfill the second element of this test, that the costs were incurred pursuant to negotiation and in anticipation of award, "the contractor must obtain the Government's prior approval for expenditures." Integrated Logistics Support Sys. Int'l, Inc. v. United States, 47 Fed. Cl. 248, 257 (2000). OK's Cascade has provided no evidence to demonstrate that the costs to renovate the kitchens were authorized by the

Forest Service.  OK's Cascade's president, vice president, and director of operations all testified that the renovations were completed in the hope of receiving an award and at OK's Cascade's own risk, with no guarantee of repayment or reimbursement.  (Vuksic, Tr. 99; McIntyre, Tr. 448; Sonnichsen, Tr. 177, 179.)   All relevant correspondence presented at trial clearly indicated that any improvements made to the equipment were at OK's Cascade's own risk and were not authorized by the Government.  Therefore, OK's Cascade cannot recover its pre-contract costs and its claim for $174,724 in direct costs cannot succeed.

### 2.  Indirect Costs

OK's Cascade requests the Court to award it $402,806 in what it refers to as "underabsorbed fixed operating and home office overhead expenses."  (Pl.'s Post-Trial Br. Arg. 7.)  OK's Cascade argues that it is entitled to these costs because it "was awarded four kitchens/sites under the [national c]ontract, but only three under the Government issued EERAs . . . ."  Id.  OK's Cascade's argument suffers from a severe misunderstanding of the facts presented at trial.   The evidence at trial unequivocally demonstrated that OK's Cascade received the same Mandatory Availability Periods and Designated Dispatch Points through the EERAs as it received under the national contract. To briefly recap, the pertinent facts regarding OK's Cascade awards as demonstrated at trial and agreed to by the parties in the joint stipulations of fact were as follows:

1. Immediately prior to the national contract award, OK's Cascade was awarded several dispatch points under pre-contract EERAs, including Albuquerque with an availability period from May 1, 2004 through June 30, 2004.  (PX 9.)

2. The national contract was awarded on July 7, 2004, and provided OK's Cascade with four dispatch points – Albuquerque, Wenatchee, Fresno, and Okanogan.  (Stip. ¶ 37; DX 13.)  The availability period for the Albuquerque dispatch point under the national contract was from May 1, 2004 through June 30, 2004.  (Stip. ¶ 37; DX 13.)

3. Under the post-contract EERA, OK's Cascade maintained the same active dispatch points and availability periods as it was awarded under the national contract, consisting of Wenatchee, Fresno, and Okanogan.  (DX 16.)  Although OK's Cascade did not receive a post-contract EERA for Albuquerque, the availability period for that location under the national contract had already expired prior to the execution of the national contract, and had already been performed under the pre-contract EERA.  (Stip. ¶¶ 43-44; DX 16; PX 9.)

Additionally, Defendant presented evidence at trial demonstrating that it offered OK's Cascade the opportunity to maintain the Albuquerque dispatch point in the post-contract EERA, but OK's Cascade rejected the Government's offer.  (DX 15.1.)

The Court is perplexed by OK's Cascade's argument that it is somehow entitled to $402,806 in under-absorbed overhead because the post-contract EERA only awarded it three dispatch points. The national contract also awarded it three dispatch points. The fourth dispatch point "awarded" under the national contact expired before the contract was even executed and was performed under the pre-contract EERA. Furthermore, it was OK's Cascade, not the Forest Service, that caused it to "only" be awarded three dispatch points in the post-contract EERA because OK's Cascade turned down the Forest Service's offer to maintain the Albuquerque dispatch point.

OK's Cascade cites two board of contract appeals decisions, both over thirty years old, in support of its argument. These decisions are easily distinguishable from the case at hand. OK's Cascade cites Southland Manufacturing Corporation for the proposition that the recovery of unabsorbed overhead is allowed when, as a result of a contract's termination, the contractor went out of business. ASBCA No. 16830, 75-1 BCA ¶ 10,994 (Nov. 29, 1974). The board recognized in Southland that unabsorbed overhead was not ordinarily recoverable in termination for convenience cases, but made an exception because the Government erroneously terminated the contract for default and barred the contractor from competing for other contracts. In contrast, here there was nothing erroneous about the Forest Service's decision and the contractor did not go out of business as a result of the termination. To the contrary, as a result of the termination OK's Cascade continued to provide the contracted for services under an EERA and was able to charge a higher rate for meals.[7]

The board decision in Wheeler Brothers, Inc. extensively quoted by OK's Cascade also does little to support its claim. ASBCA No. 20465, 79-1 BCA ¶ 13,642 (Jan. 5, 1979). In that case, the board awarded unabsorbed overhead because "that part of the actual overhead incurred during the contract term in the performance of the unterminated work which, but for the improper reduction in the volume of work, would have been recovered under the contract." Id. OK's Cascade's argument here, as with many of its arguments, suffers from the flaw that there was no reduction in the volume of OK's Cascade's work due to the termination of the agreement. Because OK's Cascade performed all the work promised to it under the national contract, there is no under-absorbed overhead and OK's Cascade is not entitled to recover any indirect costs.

---

[7]  OK's Cascade argues that because the 2005 solicitation was a total small business set-aside in which it could not participate, in essence, the Forest Service's termination "resulted in OK's going out of business for providing mobile kitchen services for national contracts for wildland firefighting activities." (Pl.'s Post-Trial Br. Arg. 11.) As noted before, the 2005 solicitation is entirely irrelevant to damages resulting from the termination of the 2004 contract, and the Forest Service never promised OK's Cascade any performance beyond the 2004 dates provided in the national contract. In essence, OK's Cascade argues that when a contract reaches its natural termination date, the contractor is put out of business for providing services under that contract. While perhaps a true statement, going "out of business" in this manner is not a compensable injury.

3. <u>Settlement Costs</u>

Finally, OK's Cascade claims $50,397 in settlement, or proposal preparation, costs. Settlement costs generally are recoverable under FAR § 31.205 and include "[a]ccounting, legal, clerical, and similar costs reasonably necessary for . . . . [t]he preparation and presentation, including supporting data, of settlement claims to the contracting officer." FAR § 31.205-42(g)(i). FAR § 49.206-1(c) provides:

> Settlement proposals must be in reasonable detail and supported by adequate accounting data. Actual, standard (appropriately adjusted), or average costs may be used in preparing settlement proposals if they are determined under generally recognized accounting principles consistently followed by the contractor.

Defendant presents three arguments in support of its position that OK's Cascade is not entitled to the asserted settlement costs. First, Defendant claims that $33,000 of OK's Cascade's costs were incurred after the commencement of this litigation and are not recoverable under the FAR, which provides for reimbursement relating to claims submitted to the contracting officer. Second, the remaining $18,000 in costs are precluded from recovery because there was no factual basis or legal merit to OK's Cascade's proposal. Third, OK's Cascade's claim fails because the settlement proposal did not provide adequate detail as required by the FAR.

The Court finds Defendant's arguments in this regard persuasive. The FAR allows for the reimbursement of reasonable costs that a contractor incurs to prepare and submit a settlement proposal to a contracting officer following a contract termination. In this case, Defendant informed OK's Cascade that it anticipated a no-cost termination. OK's Cascade nonetheless submitted a settlement claim for over $587,000 one year after contract termination. (Stip. ¶ 51.) OK's Cascade's proposal consisted of nineteen pages and was deemed by the DCAA to be barely adequate for an audit. (Draper, Tr. 636-37; Stip. ¶ 52.) Such a proposal does not comply with the requirements of FAR § 49.206-1 and therefore the costs to prepare the proposal must be denied. Furthermore, to the extent settlement proposal costs were incurred after the commencement of this litigation, the costs are improper because the FAR provides for settlement costs submitted to the contracting officer as a result of the termination. Settlement costs incurred because of pending litigation are not compensable under the FAR.

Finally, even if the FAR allowed for the reimbursement of these costs, it would undermine the integrity of the procurement system to require reimbursement for expenses incurred in meritless settlement proposals. OK's Cascade was aware that the Forest Service believed this would be a no-cost termination and, as has been discussed

throughout this opinion, OK's Cascade's claims are legally insufficient and factually unsupportable.  Therefore, OK's Cascade's claims for settlement costs are denied.

### C.  OK's Cascade Has Not Met Its Burden of Proof.

Finally, the Court turns its attention to Defendant's argument that OK's Cascade failed to support its damages calculations with reliable evidence or prove its damages to a reasonable degree of certainty.  The placement of this section at the end of the opinion should not be misconstrued as any indication of the severity with which the Court views this problem.  OK's Cascade failed to provide any expert testimony to support its damages calculations, and the calculations are plainly unsubstantiated and unreliable. Even if the Court were to have found the Forest Service liable for damages, OK's Cascade would be unable to recover because it has not fulfilled its burden to prove those damages with specificity.

OK's Cascade submits that it has fulfilled its burden and that the Court must take into account the testimony of Mr. McIntyre and Mr. Sonnichsen, in addition to that of Mr. Reed.  OK's Cascade argues that Mr. McIntyre testified to the basis behind the $5,000 figure for his time and Mr. Sonnichsen testified about OK's Cascade's per diem policy and employees he personally observed performing repairs and maintenance on the mobile kitchen units.  However, these small slivers of testimony do not suffice to justify the nearly $620,000 in damages OK's Cascade seeks as a result of what the Forest Service believed would be a no-cost termination.

The only accounting witness that OK's Cascade presented at trial to support nearly $620,000 in damages was Mr. Reed.  However, Plaintiff's counsel did not disclose Mr. Reed as an expert and Mr. Reed did not submit any expert report as required by RCFC 26(a)(2).  Therefore, Mr. Reed testified as a fact witness, but not as an expert witness. Mr. Reed works for a law firm in the Seattle, Washington area.  Nearly all of his testimony was hearsay, as he had no knowledge of any of the numbers used in the calculations.  Therefore, OK's Cascade has failed to substantiate its damages claim or provide the Court with a reasonable basis for how the numbers were calculated and thereby failed to meet its burden of proof for any of the damages it seeks.

## Conclusion

Plaintiff did not suffer any injury as a result of the Forest Service's termination for convenience and the damages it seeks are not recoverable in fact or in law.   The complaint is therefore DISMISSED with prejudice and the clerk is directed to enter judgment for the Defendant.   Pursuant to RCFC 54(d)(1), costs are awarded to Defendant.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge